# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF WISCONSIN

CLINT S. MOSAY,

                              Plaintiff,                    OPINION & ORDER

        v.
                                                           13-cv-841-wmc

EDWARD F. WALL, MICHAEL BAENEN,
PETER ERICKSEN, MICHAEL J. MOHR,
MICHAEL D. SWIEKATOWSKI, LIEUTENANT
VAN LANEN, SGT. TAERUD, CORRECTIONS
OFFICER FRISCH, COONEY, RAINIER,
HATTFIELD, HOEGGER, VERHAUGH,
DODD, WISNIENSKI, FRANKE, JOHN DOE,
JANE DOES 1-100, and AGENTS OF STATE 1-10,

                              Defendants.

        In this proposed civil action, plaintiff Clint Mosay alleges that he was subjected to the use of excessive force on multiple occasions in violation of the Eighth Amendment, and that various other defendants conspired to conceal the constitutional violations. Mosay has paid his filing fee. Because he is incarcerated, however, the court must next screen his complaint pursuant to the Prison Litigation Reform Act ("PLRA"), 28 U.S.C. § 1915A, to determine whether Mosay's proposed suit (1) is frivolous or malicious; (2) fails to state a claim on which relief may be granted; or (3) seeks money damages from a defendant who is immune from such relief. 28 U.S.C. § 1915A(b). While Mosay has stated some viable claims, the events he describes involve separate groups of defendants who are not properly joined in a single lawsuit. Before he will be allowed to proceed, therefore, Mosay must inform the court which of his two distinct lawsuits he wishes to pursue under this case number.

ALLEGATIONS OF FACT

In addressing any *pro se* litigant's pleadings, the court must read the allegations of the complaint generously. *Haines v. Kerner*, 404 U.S. 519, 520-21 (1972). For purposes of this order, the court accepts plaintiff's well-pleaded allegations as true and assumes the following probative facts.

**A. Parties**

Plaintiff Clint S. Mosay is in the custody of the Wisconsin Department of Corrections ("DOC") and currently incarcerated at Green Bay Correctional Institution ("GBCI"). At all times relevant to this suit, defendant Edward F. Wall was the Secretary of DOC. In that capacity, he served as the final decision-maker with regard to all offender complaints filed through the Inmate Complaint Review System ("ICRS"). Defendant Michael Baenen was the Warden at GBCI; defendants Wall and Baenen were responsible for training Correction Officers at GBCI. Defendant Peter Ericksen was the Security Director for the DOC assigned at GBCI, and defendant Michael J. Mohr was an Institution Complaint Examiner ("ICE") assigned at GBCI.

In addition, defendants Swiekatowski and Van Lanen were lieutenants and DOC supervisors, assigned at GBCI in a supervisory capacity. Other named defendants are Sgt. Taerud and Correction Officers Frisch, Cooney, Rainier, Hattfield, Hoegger, Verhaugh, Dodd, Wisnienski and Franke, all also employed by the DOC and assigned to GBCI.

Finally, defendants John Doe and Jane Does 1 through 100 are "persons yet to be revealed through [d]iscovery," as are "Agents of the State 1-10."

### B. The Tasing Incident

On or about August 6, 2012, plaintiff Mosay was taken to St. Vincent's Hospital for possible gastrointestinal issues. Defendants Wall, Baenen and Ericksen have allegedly created and implemented a prison policy, which requires inmates to wear a "Bandit Electronic Control Device" ("Bandit Device") whenever they exit the prison for off-grounds treatment or appointments.  Pursuant to this policy, when transported to St. Vincent's, Mosay had a Bandit Device strapped to his lower leg.  He was also clad in mechanical restraints.  At some point during his visit to the hospital, Mosay was also chained to a hospital bed.

Defendants Hoegger and Wisnienski were among multiple, rotating pairs of guards required to supervise Mosay.  Apparently, Wisnienski had been trained and certified in the maintenance and use of the Bandit Device, while Hoegger had not.  Nevertheless, Wisnienski chose to hand the separate trigger to the Device to Hoegger so that he could use the restroom.

While Wisnienski was away, Hoegger allegedly began to spin the trigger around and around on his finger.  During that time, Hoegger applied too much pressure to the trigger button, and the Bandit Device activated, administering over 10,000 volts of electricity into Mosay's left leg.  The Bandit Device allegedly has a safety mechanism requiring three to five seconds of continuous pressure before it will activate, allowing for an inference that the activation was not accidental.

After the electric shock, neither Hoegger nor Wisnienski wrote an Accident or Incident Report.  Neither officer permitted Mosay to get medical attention for the shock.

Rather, Hoegger attempted to appear surprised, while Wisnienski laughed and made comments such as, "That's unbelievable!"

When defendant Cooney arrived, Mosay advised her of what had happened during the previous shift.  At first, Cooney merely laughed.  Later, she used the hospital telephone to call a friend or acquaintance, during which time Cooney discussed the incident and again laughed about it.

While Mosay was in the hospital, other guards who came through included Rainier, Hattfield, Franke, Dodd and Verhaugh.  Mosay discussed the incident with each of them and requested that each prepare an Incident Report or summon medical personnel.  None of these officers would report the incident.  Defendant Franke in particular advised Mosay that "if he was talking then he must be all right."  (Compl. (dkt. #1) ¶ 28.)  Only after Mosay had left St. Vincent's and returned to GBCI was he permitted to report the incident to another correctional officer, Segerstrom, who was escorting him to Health Services for a mandatory vitals check.  Segerstrom then contacted the shift supervisor, a Lieutenant Baumann, about the incident.[1]

### C. The Examination

On August 7, 2012, Mosay was seen by the nursing staff at GBCI, who conducted a preliminary examination per security's request.  Mosay had two well-defined circular red marks on his left lower calf, which were approximately three-quarters of an inch in diameter, but he did not have any inflammation.  On August 8, 2012, Registered Nurse Jean Ludsey completed a Nursing Encounter Protocols sheet, which reads in relevant part:

---

[1] Neither Segerstrom nor Baumann is named as a defendant.

> P[atien]t ambulates into HSU without limp. . . . Pt has 2 perfectly round red dime sized circles on left posterior calf approx 3-4 inches apart vertically. Outside border is red, not raised with normal appearing skin in center.  C.O. Giffin states now that appears to be consistent with markings from a Bandit.  No edema of left calf, ankle or foot.  DP & PT pulses palpable.  Capillary refill left toes less than 3 seconds.  Left foot warm.  Heart tones tachy but regular.  Lungs are clear T.O.  Abdomen soft, nontender with normal bowel sounds x 4 quads.  Pt appears anxious.

(Compl. Attachment 3 (dkt. #1-1) 3.)

As a result of the shock administered by the Bandit Device, among other reasons, Mosay allegedly continues to suffer from an increase in his life stress.

**D. Mosay's Offender Complaints Related to the Tasing Incident**

On August 8, 2012, Mosay signed and submitted an Offender Complaint, complaining that Hoegger shocked him with the Bandit Device and then failed to report the incident to supervisors.  Mosay also complained of other correction officers' reactions to the incident and their failure to report it, indicating that Lt. Baumann had been notified of the incident upon Mosay's return to GBCI.

The next day, August 9, Mosay received a receipt labeling his grievance as GBCI-2012-16615.  On that same day, defendant Mohr recommended that the grievance be dismissed, stating:

> Because the allegations raised in this complaint have already been brought to the attention of supervisor staff and are already under review, there is no need to conduct a parallel investigation in the ICRS.  The allegations are being addressed in a manner similar to DAI Policy 310.00.01.  Because that investigation process is regulated by state law which protects the privacy and due process rights of staff, no further information will be given to the inmate.  Therefore, it is recommended this complaint be dismissed.

5

On that same day, defendant Baenen accepted this recommendation, and Mosay's complaint was dismissed.

On or about August 10, Mosay appealed to the Corrections Complaint Examiner ("CCE"), arguing that dismissing the claim without further investigation was "sketchy" and asking for the matter to be thoroughly examined by outside sources. On August 17, Mosay received a CCE Receipt. On August 20, the CCE recommended that the appeal be dismissed, because the ICE had correctly assessed there was no need for a parallel investigation in the ICRS. On or about August 31, the Office of the Secretary accepted that recommendation and the complaint was dismissed.

### E. The Search

On or about April 2, 2013, at approximately 8:00 P.M., Mosay was in his assigned cell, Cell H-61, in the South Cell Hall, eating a bag of potato chips. Suddenly, the cell door slammed open and defendants Swiekatowski, Taerud and Frisch rushed into his cell. Swiekatowski then grabbed Mosay by the neck and began to choke him. While Taerud and Frisch grabbed hold of Mosay, Swiekatowski also held a Taser about an eighth of an inch from Mosay's nose. Defendant Van Lanen positioned himself at the cell door with a digital video camera, impeding any escape route from the cell.

Referring to the potato chips that Mosay had been eating, Swiekatowski, Taerud and Frisch began yelling for Mosay to "spit it out!" Once Mosay managed to spit the chips into one of the defendant's hands, the defendant added, "It was only chips." The defendants then stood Mosay up, handcuffed him and performed a pat-down search.

Swiekatowski, Taerud, Frisch and Van Lanen then led Mosay down the tier, out of the main building and to the segregation building, where he was placed in a filthy strip search area and told to disrobe. While Van Lanen was still recording, he noted a bruise on Mosay's foot, which had been caused by the earlier confrontation in Mosay's cell. Approximately five or six other Correctional Officers, possibly including a female officer, stood watching as some of the defendants performed a body cavity inspection. This inspection appeared to be done solely to humiliate, dehumanize, harass and embarrass Mosay, which caused him psychological and emotional distress.

### F. Mosay's Offender Complaints Relating to the Search

On or about April 9, 2013, Mosay signed and submitted through the ICRS an offender complaint numbered GBCI-2013-6981, challenging the April 2 search. That complaint highlighted that Mosay had offered no resistance and had been blindsided by the defendants' attack. On that same day, Mohr recommended that the grievance be dismissed.

Mohr's recommendation was based on an Incident Report that Sergeant Taerud had completed for the cell entry in question. Taerud wrote that Lieutenant Swiekatowski informed him on April 2nd that they had received credible information indicating: (1) Mosay was in possession of heroin, cocaine and marijuana; and (2) Mosay would have those items not only hidden in his cell, but also on his person, specifically in his mouth and buttocks. Taerud further wrote that they planned a cell entry and that when the cell door opened, Swiekatowski entered with the Taser trained on Mosay and ordered Mosay to get down. Taerud also wrote that he placed his right hand on Mosay's shoulder to stabilize him against the wall. Having observed that Mosay had something in his mouth, Taerud

acknowledged placing his left hand on Mosay's throat to determine if he was swallowing anything.  He then ordered Mosay to spit out what was in his mouth, which he did.

According to Taerud's report, the officers then brought Mosay to his feet, moved his hands behind his back and placed handcuffs on his wrist, escorting him to the segregation unit.  The report also indicated that they performed a strip search and body check on Mosay, with Van Lanen noting that Mosay had a possible track mark on his toe.  Mosay was placed in TLU pending investigation of drug possession.  After his cell was searched, a smoking device was found that tested positive for marijuana.

Based on Taerud's incident report, Mohr concluded that the complaint had been "reduced to one person's word against the written reports by staff."  Because ICE would have had to speculate on the amount of force used by staff without other evidence, Mohr recommended dismissal of the complaint.  Mohr failed to note that the video footage taken by Van Lanen was available to him, nor did he review it.

On or about May 9, 2013, Baenen accepted Mohr's recommendation without conducting his own investigation of the matter.  Accordingly, on or about May 14, Mosay signed and submitted an appeal of the dismissed complaint to the CCE and the Office of the Secretary.  In his appeal, Mosay argued that ICE had failed to investigate the incident properly, pointing out that there was no need to speculate about the force used by the officers since it was available in the footage recorded by Van Lanen.  On or about May 17, Mosay received a CCE Receipt and Report, recommending that his appeal be dismissed. The Report included the following statement: "The inmate is advised that illegal drugs will not be tolerated."  (Compl. (dkt. #1) ¶ 69.)

8

OPINION

## I. The Tasing Incident

### A. Excessive Force

"The 'unnecessary and wanton infliction of pain' on a prisoner violates his rights under the Eighth Amendment." *Lewis v. Downey*, 581 F.3d 467, 475 (7th Cir. 2009) (quoting *Whitley v. Albers*, 475 U.S. 312, 319 (1986)).  On the other hand, the use of *de minimis* force, so long as it is not of the sort "repugnant to the conscience of mankind," does not implicate the Eighth Amendment.  *Id.* (quoting *Hudson v. McMillian*, 503 U.S. 1, 9 (1992)).  If force is more than *de minimis*, then the court must consider "whether it 'was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.'"  *Id.* (quoting *Hudson*, 503 U.S. at 7).

Here, Mosay alleges that Hoegger used the Bandit Device to deliver a 10,000-volt shock to his left leg.  The court has no trouble concluding that this jolt was more than *de minimis* force.  *See Lewis*, 581 F.3d at 475 (holding that a taser jolt is more than a *de minimis* application of force); *Matta-Ballesteros v. Henman*, 896 F.2d 255, 256 n.2 (7th Cir. 1990) (noting that a taser "sends an electric pulse through the body of the victim causing immobilization, disorientation, loss of balance, and weakness").

Looking to the next step of the analysis, Mosay has also alleged that at the time Hoegger used the Bandit Device, Mosay was chained to his hospital bed, receiving treatment for a gastrointestinal problem.  Accepting that fact as true, Hoegger could have had no legitimate reason for deploying the Bandit Device on Mosay, making his use of the taser gun "*per se* malicious."  *See Fillmore v. Page*, 358 F.3d 496, 504 (7th Cir. 2004) ("Infliction of pain that is 'totally without penological justification' is *per se* malicious.")

9

(quoting *Hope v. Pelzer*, 536 U.S. 730, 737 (2002)).  Additionally, from Mosay's allegations, one could infer that Hoegger intentionally, rather than negligently, deployed the Bandit Device, since he alleges that three to five seconds of continuous pressure on the trigger is necessary to administer a shock.  Accordingly, Mosay has pled a viable Eighth Amendment excessive force claim against Hoegger.

### B. Failure to Protect and Deliberate Indifference

Mosay further alleges that Wisnienski, Cooney, Rainier, Hattfield, Dodd, Franke and Verhaugh "stood by and did not intervene in the [u]se of [f]orce" and that they are liable for the failure to protect him under the Eighth Amendment.  To state a failure to protect claim, an inmate must allege that:  (1) he is incarcerated under conditions posing a substantial risk of serious harm; and (2) defendants acted with deliberate indifference to that risk.  *Brown v. Budz,* 398 F.3d 904, 909 (7th Cir. 2005).  Deliberate indifference itself has two components:  (1) a defendant must have actually known that the inmate was at risk; and (2) the defendant must have disregarded that risk by failing to take reasonable measures in response.  *Id.* at 913 (citing *Farmer v. Brennan*, 511 U.S. 825, 838 (1994)).

With respect to the "substantial risk" requirement, Mosay has alleged that he was wearing a Bandit Device and that Hoegger was not trained to use it properly, but was nevertheless given control of the device's trigger.  While a close question, even given the low bar at the screening stage, Mosay has alleged sufficient facts to permit a finding that the failure to maintain the trigger in competent hands posed a substantial risk of serious harm.

The problem with Mosay's claims arises at the "deliberate indifference" stage. Officers Cooney, Rainier, Hattfield, Dodd, Franke and Verhaugh, all of whom Mosay

10

accuses of failing to protect him, were not even present at St. Vincent's in the time leading up to the tasing incident, and there is no way they could have possessed the actual knowledge of the risk of harm that is required to state a failure to protect claim. Indeed, as far as any of these defendants know, Wisnienski was in possession of the trigger when he and Hoegger were guarding Mosay. Moreover, the actions that the other defendants took or failed to take *after* Mosay was shocked -- for instance, Cooney's telephone conversation or the other defendants' failure to write up an accident report -- do not demonstrate that they had known of a risk to Mosay *before* he was shocked but failed to take action, nor that they had reason to think Mosay continued to face any risk of reoccurrence of the events leading up to his tasing. Accordingly, Mosay may not proceed on failure to protect claims against any of those defendants.

The one exception to the general deficiency of Mosay's failure to protect claims is, of course, Wisnienski. Mosay has alleged that Wisnienski himself turned the trigger over to Hoegger, who was not trained to use it. This at least allows for an inference that Wisnienski knew Mosay was at substantial risk of serious harm once the untrained and unsupervised Hoegger was left with the trigger device, but disregarded that risk. Thus, Mosay may proceed on a failure to protect claim against Wisnienski.

Reading Mosay's claims generously, he may also have intended to state a claim for deliberate indifference against defendants based on the denial of medical treatment for the electrical shock. (*See, e.g.*, Compl. (dkt. #1) ¶ 28.) In particular, Mosay alleges that he "adamantly discussed the incident" with Cooney, Rainier, Hattfield, Franke, Dodd and Verhaugh, requesting that a medical person be summoned to treat him, but that he never received such care. The problem is that it does not appear that Mosay was at substantial

11

risk of *serious* harm when he made those requests, nor does it appear that the defendants believed him to be at such a risk.  For example, Mosay does not allege that the shock was causing him pain, weakness or dizziness.  In fact, the *only* evidence he submits with regard to the aftereffects of the shock is the Nursing Encounter Protocols report, which suggests that the shock did not cause him any serious harm at all.  (*See* Compl. Attachment 3 (dkt. #1-1) 3.)

While it may well have been more prudent for the correctional officers to have Mosay checked by a medical professional -- particularly since the incident took place at a hospital -- "the Eighth Amendment does not apply to every deprivation, or even every unnecessary deprivation, suffered by a prisoner, but *only* [to] that narrow class of deprivations involving serious injury inflicted by prison officials acting with a culpable state of mind."  *Snipes v. DeTella*, 95 F.3d 586, 590 (7th Cir. 1996) (quoting *Hudson*, 503 U.S. at 19 (Thomas, J., dissenting)) (internal quotation marks omitted)).  Accordingly, without more, Mosay may not bring claims against these defendants for denial of medical care.

### C. Conspiracy to Obstruct Justice

Mosay also alleges that defendants Wisnienski, Hoegger, Cooney, Rainier, Hattfield, Franke, Dodd and Verhaugh attempted to obstruct justice in violation of 42 U.S.C. § 1985(2) and conspired to deprive him of the equal protection of the laws in violation of 42 U.S.C. § 1985(3) when they failed to file an incident or accident report.  His theory appears to be that the failure to file a report was part of a conspiracy intended to prevent him from exhausting his administrative remedies, which would in turn prevent him from obtaining relief in court.  (*See* Compl. (dkt. #1) ¶¶ 30-32.)

12

Rule 8 requires a pleading to contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The Supreme Court has held that this requires "more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Thus, when a complaint "pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id*. (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556-57 (2007)). Here, Mosay alleges only that none of the defendants filed an accident or incident report. While "consistent" with his theory of conspiracy, this lone fact offers nothing more than the *mere possibility* of wrongdoing. Without more, Mosay's claims are not plausible under *Twombly* and *Iqbal*.

Even assuming Mosay had pled sufficient facts to make his conspiracy theory plausible, he points to nothing requiring defendants to file an accident report for Mosay to exhaust his administrative remedies. In particular, the procedures for use of the Inmate Complaint Review System ("ICRS") contain no such requirement. *See* Wis. Admin. Code § DOC 310. Moreover, Mosay was expressly authorized to file a grievance regardless of whether the correctional officers filed an accident report. *See* Wis. Admin. Code § DOC 310.08(1) ("An inmate may use the ICRS to raise significant issues regarding rules, living conditions, staff actions affecting institution environment, *and civil rights complaints* in accordance with this chapter.") (emphasis added); § DOC 310.11(5) (listing reasons the Institution Complaint Examiner may reject a complaint, which do not include lack of accident report or "paper trail"). Thus, Mosay has not stated a viable claim of conspiracy and may not proceed on his § 1985 claims.

13

### D. Supervisory Liability

Mosay next seeks to bring claims against defendants Wall, Baenen, Ericksen and Mohr, alleging that each of them maintained the policy requiring prisoners to wear Bandit Devices on hospital trips, making them responsible for ensuring that officers are properly trained in the use of that device. Mosay alleges that their failure either to train Hoegger or to alter the policy governing escorts of prisoners off-grounds to protect against untrained personnel having access to the device's trigger, rises to the level of "callous indifference."

Mosay faces a substantial challenge in stating claims against these supervisory defendants. The doctrine of *respondeat superior* does not apply in the § 1983 context, so these defendants cannot be held liable for their subordinates' conduct simply because they are supervisors. *Chavez v. Ill. State Police*, 251 F.3d 612, 651 (7th Cir. 2001). Likewise, though Mosay apparently intends to state a failure to train claim, "failure to train claims are usually maintained against municipalities, not against individuals, and, in the Eighth Amendment context, such claims may only be maintained against a municipality." *Sanville v. McCaughtry*, 266 F.3d 724, 739-40 (7th Cir. 2001) (internal citations omitted). Thus, to maintain a claim against the supervisory defendants, Mosay must allege facts showing they have sufficient *personal responsibility* in the unconstitutional conduct. Said another way, the facts must support a finding that they "directed the conduct causing the constitutional violation, or . . . it occurred with [their] knowledge or consent." *Id.* at 740.

The facts Mosay alleges simply do not allow for an inference of personal involvement in the tasing incident on the supervisors' part. Even assuming they knew that Hoegger was untrained in the use of the Bandit Device, there is not allegation that they *directed* his access to the trigger, much less his using it maliciously or sadistically, nor could one reasonably

14

infer from the alleged facts that Hoegger's actions occurred with their knowledge or consent. Similarly, the fact that these defendants maintained a policy requiring prisoners to wear Bandit Devices off-grounds does not support an inference that they have directed or consented to the malicious (or even negligent) use of those devices.  Thus, Mosay has failed to state a viable Eighth Amendment claim against the supervisory defendants.

### E.  Access to the Courts

As for Mosay's First and Fourteenth Amendments claims against defendants Wall, Baenen and Mohr, his apparent theory is convoluted at best.  In short, Mosay appears to assert that by recommending and approving the dismissal of his grievance without conducting an independent investigation, these defendants intended to deprive him of the right to file suit with respect to his excessive force claim, and thereby interfered with Mosay's right to petition the government for redress, as well as his right to equal protection and due process.  As a preliminary matter, the First Amendment does not mandate prison grievance procedures even exist.  Moreover, these procedures "do not by their very existence create interests protected by the Due Process Clause."  *Owens v. Hinsley*, 635 F.3d 950, 953-54 (7th Cir. 2011) ("[T]he alleged mishandling of [inmate's] grievances by persons who otherwise did not cause or participate in the underlying conduct states no claim.").  Likewise, with respect to any intended equal protection claim, Mosay has failed to plead that he was arbitrarily treated differently from others similarly situated.  *See United States v. Moore*, 543 F.3d 891, 896 (7th Cir. 2008).  Thus, Mosay may not proceed on these claims, at least as pled.

Reading Mosay's complaint generously, he *may* have intended to state a claim for denial of access to the courts.  *See Lewis v. Casey*, 518 U.S. 343, 355 (1996) (right of access to courts guarantees inmates the tools "that the inmates need in order to attack their sentences, directly or collaterally, and in order to challenge the conditions of their confinement").  To state such a claim, however, Mosay must allege facts suggesting that the actions of prison officials have caused him an actual injury in the form of prejudice to an underlying cause of action.  *Eichwedel v. Chandler*, 696 F.3d 660, 673 (7th Cir. 2012).  At a minimum, this standard would require Mosay to show that "the blockage prevented him from litigating a nonfrivolous case."  *Walters v. Edgar*, 163 F.3d 430, 434 (7th Cir. 1998).

Mosay has alleged no such injury here.  For starters, Wall's and Baenen's decision not to conduct a parallel investigation and to affirm the dismissal of Mosay's grievances has not prevented Mosay from litigating this case.  Nor has Mohr's recommendation that his inmate complaint be dismissed prevented Mosay from pursuing his claim.  On the contrary, he has filed suit here and has been granted leave to proceed on the very Eighth Amendment claim with which he alleges Wall and Baenen have tried to interfere.  Thus, Mosay has failed to state an access-to-courts claim and will not be allowed to proceed against Wall and Baenen on that basis.

**F.  State Law Claims**

Finally, Mosay invokes Wis. Stat. §§ 940.29 and 946.12 in his complaint.  Both those statutory sections describe criminal offenses that only public law enforcement officials could pursue in court.  Mosay offers nothing suggesting that either gives rise to a private right of action.  Accordingly, Mosay cannot maintain claims under those statutes.

## II. The Search

### A.  Excessive Force and Harassment Claims

With respect to the later entry into his cell, Mosay claims that Swiekatowski used excessive force by rushing into his cell, grabbing him by the throat and beginning to choke him.  For the purposes of screening, the court will infer that the alleged choking went well beyond *de minimis* force.  Because Mosay alleges it was unprovoked and occurred as he sat in his cell eating, the court will also infer for now that Swiekatowski's use of force was malicious, rather than employed in a good-faith effort to restore discipline, maintain order or even, as might be inferred against Mosay, to retrieve suspected contraband.

Mosay further alleges that Taerud and Frisch "took hold of [his] person," and presumably due to this hold, that he suffered a bruise on his foot.  Case law is clear that "not every push or shove by a prison guard violates a prisoner's constitutional rights." *DeWalt v. Carter*, 224 F.3d 607, 620 (7th Cir. 2000).  Even reading Mosay's allegations generously, officers' actions in taking hold of his person and leaving a single bruise do not rise above the level of *de minimis* force.  *See Jones v. Walker*, 358 F. App'x 708, 713 (7th Cir. 2009) ("A single shove that results in bruising is de minimis force that will not support a claim of excessive force.").  Thus, Mosay may not proceed on an excessive force claim against those officers, at least not based on the injury to his foot.

Mosay next alleges that he was subjected to a ten-to-fifteen-minute body cavity inspection by Swiekatowski, Taerud and Frisch.  "In the context of bodily searches performed upon those incarcerated in our prison system, only those searches that are maliciously motivated, unrelated to institutional security, and hence totally without penological justification are considered unconstitutional." *Whitman v. Nesic*, 368 F.3d 931,

934 (7th Cir. 2004) (quoting *Meriwether v. Faulkner*, 821 F.2d 408, 415 (7th Cir. 1987)) (internal quotation marks omitted). Prison officials are permitted to touch, pat down and search a prisoner in order to determine whether the prisoner is hiding anything dangerous on his person. *Turner v. Huibregtse*, 421 F. Supp. 2d 1149, 1151 (W.D. Wis. 2006) (citing *Whitman*, 368 F.3d at 934). A search of a prisoner, however, may violate the Eighth Amendment if it is "conducted in a harassing manner intended to humiliate and inflict psychological pain." *Calhoun v. Detella*, 319 F.3d 936, 939 (7th Cir. 2003).

Mosay alleges that the search was done simply to humiliate, dehumanize and harass him. This somewhat conclusory allegation might be insufficient by itself for Mosay to get past screening, but he also alleges that Swiekatowski, Taerud and Frisch performed the search in a "filthy" area in front of five or six other officers, potentially including a female officer. Although the circumstances and location of the cavity search may have been justified (and indeed, the complaint suggests that the officers may have believed Mosay was secreting heroin, cocaine and marijuana on his person), the court must credit, at least for screening, Mosay's allegation that Swiekatowski, Taerud and Frisch performed the search in front of various other officers in order to embarrass and harass him. Accordingly, Mosay may proceed past screening on Eighth Amendment harassment claims against these defendants with regard to the body cavity search.

## B. Access to the Courts Claim against Taerud

Mosay separately alleges that Taerud falsely claimed that he had choked Mosay, in order to cover up the incident and disguise the identity of the true assailant. Mosay further states that this is an attempt to "make it near impossible for [him] to recover damages from

18

any redress sought." (Compl. (dkt. #1) ¶ 71.)  Whether or not this is so is, at best, open to debate.  Mosay himself alleges that there is camera footage showing the alleged assault. Assuming it still exists, if Taerud is lying, it will be a simple matter to undermine his story.

Even if this were not so, Taerud's supposed attempt to "cover up the incident" does not prevent Mosay from litigating this case.  *First*, he can make the same argument to the jury.  *Second*, in an abundance of caution, the court will allow Mosay to proceed against Taerud on a claim of excessive force based on the choking, in the event the jury should credit Taerud's version of what happened during the alleged storming of Mosay's cell.  In any event, the mere fact that a witness may have a different recollection of events is not enough to prove a denial of access to courts.  If it were, most cases would allow for such a claim.  Ultimately, Mosay has failed to make a plausible showing of "actual injury" from this supposed deprivation, and he may not proceed on an access to courts claim.

### C. Deliberate Indifference Claims

Mosay alleges that Mohr, Baenen, Wall and Van Lanen were "callously and deliberately indifferent" to the cavity search.  Assuming Mosay means to invoke the Eighth Amendment and hold these defendants liable for a failure to protect him from harassment, he has succeeded in stating such a claim against Van Lanen only.  As noted above, liability for failure to protect depends not only on the inmate being at substantial risk of serious harm, but also on defendants' deliberate indifference.  *Brown,* 398 F.3d at 909.  From the facts Mosay alleges, only Van Lanen was *actually aware* of the allegedly humiliating and harassing cavity search, because he was allegedly present and filming it.  Assuming, as the court must at screening, that the cavity search was performed in the degrading manner

Mosay alleges, the court can infer that Van Lanen actually knew of the risk of harm to Mosay and failed to take reasonable steps to alleviate that harm.

Against Mohr, Baenen and Wall, however, Mosay makes no such claim.  He alleges only that they "chose not to address" the search, despite the grievances that Mosay filed.  In short, there is no suggestion that they actually knew of the allegedly unconstitutional search before or during its occurrence, but rather failed to act after-the-fact.  To the extent Mosay's theory is that Mohr, Baenen and Wall violated his constitutional rights simply by dismissing his grievances or by performing an unsatisfactory investigation, as noted above, "the alleged mishandling of . . . grievances by persons who otherwise did not cause or participate in the underlying conduct states no claim."  *Owens*, 635 F.3d at 953.  Therefore, Mosay may not proceed with claims against Mohr, Baenen and Wall on these grounds.

### D. State Law Claims

Finally, Mosay again invokes Wis. Stat. §§ 940.29 and 946.12 in connection with the cavity search.  As previously discussed above, these statutes describe criminal offenses and do not give rise to a private right of action, so Mosay may not proceed on any claims under these statutes.  *See,* discussion*, supra,* Section I.F.

### III. John and Jane Doe Defendants

In addition to the defendants discussed above, Mosay named one John Doe defendant and one hundred Jane Doe defendants, as well as ten unidentified "Agents of the State" as additional defendants in this case.  Mosay alleges *no* facts in his complaint that suggest any such unidentified party was personally involved in any unconstitutional conduct, let alone enough facts to make their involvement plausible, as Rule 8 requires.

20

Therefore, Mosay may not proceed on any claims against these defendants, and they will be dismissed from the case.

## IV. Joinder Issues

While Mosay has stated some viable claims arising from both of the incidents discussed above, his current lawsuit falters for a different reason: his claims are improperly joined.  A plaintiff may only join "either as independent or as alternate claims, as many claims, legal, equitable, or maritime, as the party has against an opposing party."  Fed. R. Civ. P. 18(a).  As a corollary, a plaintiff is only allowed the joinder of several defendants if the claims arose out of a single transaction or series of transactions and contain a question of fact or law common to all the defendants.  Fed. R. Civ. P. 20(a).  The Seventh Circuit has emphasized generally that "unrelated claims against different defendants belong in different suits," and specifically that federal joinder rules apply to prisoners just as to other litigants. *George v. Smith*, 507 F.3d 605, 607 (7th Cir. 2007).

Here, Mosay describes two entirely separate incidents, both factually and legally. The first set of claims arises from the incident in which Hoegger activated the Bandit Device and shocked him; his second set of claims arises from an unrelated incident in which an entirely different set of defendants entered his cell, allegedly applied an unnecessary amount of force to subdue him, and conducted a cavity search intended to harass and humiliate him.  These two events do not constitute a single transaction or series of transactions, nor can the court imagine any question of law or fact common to all defendants that may arise. Because these incidents fail to satisfy the requirements of Federal Rule of Civil Procedure

20(a), Mosay may not proceed in a single lawsuit against these two separate groups of defendants for unrelated events and claims.

Mosay has until January 28, 2015, to inform the court which of his two sets of claims he wishes to pursue in this lawsuit. If he wishes to proceed on the other set of claims in a separate lawsuit, Mosay should also inform the court as much, and the court will sever those claims into a different lawsuit, for which he will then need to pay the filing fee or move for leave to proceed *in forma pauperis*. If Mosay fails to inform the court which set of claims he wishes to pursue in this suit by January 28th, this case will be closed in its entirety without further notice pursuant to Federal Rule of Civil Procedure 41(b).

## ORDER

IT IS ORDERED that:

1) plaintiff Clint S. Mosay has until January 28, 2015, to inform the court whether he wishes to proceed with:

   (a) his Eighth Amendment excessive force claim against Hoegger and Eighth Amendment failure to protect claim against Wisnienski; **OR**

   (b) his Eighth Amendment excessive force claim against Swiekatowski and Taerud; harassment claims against Swiekatowski, Taerud and Frisch; and his Eighth Amendment failure to protect claim against Van Lanen.

2) Until he makes this election, Mosay is DENIED leave to proceed on any other claims.

3) If Mosay does not inform the court by January 28, 2015, which set of claims he wishes to pursue, this case will be closed without further notice pursuant to Fed. R. Civ. P. 41(b).

Entered this 8th day of January, 2015.

BY THE COURT:

/s/

_____

WILLIAM M. CONLEY
District Judge