IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

CLINT S. MOSAY,

|  |  |  |
|---|---|---|
| | Plaintiff, | OPINION & ORDER |
| v. | | |
| | | 13-cv-841-wmc |

DALE HOEGGER and DAVID WISNIEWSKI,

Defendants.

---

*Pro se* plaintiff Clint S. Mosay, an inmate at Green Bay Correctional Institution ("GBCI"), was granted leave to proceed on claims that two of its correctional officers, defendants Dale Hoegger and David Wisniewski, violated his rights under the Eighth Amendment.  Specifically, Mosay claims that Hoegger used excessive force against him when he activated a Band-It electronic control device attached to his ankle while he was receiving care at a hospital.  He further claims that Wisniewski failed to protect him from Hoegger's use of excessive force.

Defendants filed a motion for summary judgment, along with proposed findings of fact and supporting evidence, on November 23, 2015.  (Dkt. ##22, 24.)  Mosay failed to file any opposition or other response to defendants' motion for summary judgment.  After reviewing the evidence, the court will now grant defendants' motions for summary judgment in its entirety.

UNDISPUTED FACTS[1]

## A.     The Parties and Setting.

Mosay's claims arise from an incident on August 6, 2012.  On that date, Mosay was receiving inpatient medical care at St. Vincent Hospital in Green Bay.  Correctional officers Hoegger and Wisniewski were supervising Mosay at the hospital.  Corrections personnel refer to this type of shift as a "hospital vigil."

In order to maintain safety of hospital staff, corrections staff and inmates, corrections staff use a "Band-It" device when inmates are receiving in-patient medical care at a hospital. The Band-It is attached to an inmate's ankle, and can be activated to deliver an electric shock to the inmate.  The Band-It is intended to deter inmates from engaging in uncooperative or dangerous behavior.  During a hospital vigil, at least one supervising officer must be trained in use of the Band-It device and the remote must be monitored at all times.[2]

## B.     The Band-It Device.

The Band-It device is activated by a rocker-type switch.  There is a safety strap over the switch, which helps prevent accidental pressure on the switch.  After the switch is depressed for approximately a half second of continuous pressure, there is one audible alert beep.  After approximately one second of additional constant pressure, the Band-It device is

---

[1] Because Mosay failed to respond to defendants' proposed findings of fact, those facts are adopted consistent with Fed. R. Civ. P. 56(e)(2) and this court's standing summary judgment procedure.  *See* April 28, 2015 Pretrial Conference Rept., dkt. #15, at 20, ¶ C ("Unless the responding party puts into dispute a fact proposed by the moving party, the court will conclude that the fact is undisputed.").

[2] Band-It training is a one-day class, which includes learning about the device and how it works. During the Band-It training class, each participant is required to wear the device and experience the effects of the device on their own body.

then activated.  In order for the device to go off, the switch must be depressed for that entire time.  The Band-It device runs for approximately eight seconds after activation.  Once activated, the switch no longer needs to be depressed.  If the device is equipped with a SAFE (self-activation feature), which is a lanyard type attachment, and the lanyard was not fastened securely, the device may be activated without depressing the switch.

The Band-It device affects everyone differently.  When activated on an individual, the affected muscles between the contact points on the Band-It will quickly contract, generally immobilizing that area of the body.  Once the approximate eight second cycle is completed, an individual generally gains normal operation of the affected muscle.  Typically, an individual can speak and control movement in other parts of his body throughout the activation cycle, though there are times when the entire body tenses up, effectively preventing any movement until the cycle is complete.  Even so, many individuals react to activation by falling to the ground, yelling, and losing the ability to speak in a normal tone.

The shock of the device itself does not cause any known lasting effects to a person's overall health and wellbeing, although there can be secondary injuries from a person falling and hitting an object.

The Band-It does leave two circular burn marks approximately 3.5 inches apart after activation.  There is not a set, or even approximate, time frame when these signature burn marks go away; it depends on the person and how quickly they heal.  The affected muscle group may also be sore for a day or so.

Finally, whether or not activated, the device can leave impression marks where the contact points are placed due to the tightness of the Band-It when applied and secured.  In some cases, impression marks last for a couple of days.  Similarly, the device can cause

3

marks on a person without activation if the person has an allergic reaction to the nickel on the metal portion of the Band-It that touches skin.

**C.     The August 6, 2012 Incident.**

On August 6, 2012, defendant David Wisniewski was the officer on the hospital vigil who was trained in using the Band-It, and he was responsible for operating the Band-It remote.  At one point, Wisniewski needed to use the restroom and handed Hoegger the remote for the Band-It device.  While defendant Dale Hoegger was *not* trained in the Band-It, Wisniewski believed the remote should remain in the same room as the Band-It device. At the time, Hoegger was sitting down in a chair, and he secured the device by wrapping the string, which was connected to the remote, around his finger.  At that time, plaintiff Clint Mosay was lying in his hospital bed.

Approximately two minutes after Wisniewski left the remote with Hoegger, Mosay said, "Hey, you are shocking me."  Hoegger was confused because he did not believe that he had done anything to activate the device.  He also had not heard any warning beeps indicating that the device had been activated.  Immediately looking at Mosay, Hoegger did not see any part of his body moving, nor did he appear to be in any kind of distress.

Wisniewski was in a restroom attached to Mosay's hospital room, and hearing Mosay say that he had been shocked, he immediately came back into the room and asked what was going on.  Mosay stated to Wisniewski, "What took you so long to turn it off?"  Wisniewski asked, "Turn off what?"  Mosay responded, "The Band-It."

Hoegger then told Wisniewski that Mosay believed he had been shocked.  He also asked Wisniewski if the Band-It could have been set off by wrapping the string around his

4

finger, and Wisniewski said he did not think so.  Wisniewski and Hoegger both asked Mosay if he wanted to see a nurse and he told them that he did not.  He said that it did not hurt, but just tingled a bit.  During the conversation, Mosay was sitting up calmly in his bed and talking in a normal, conversational tone.  At no time did Mosay raise his voice or show any signs of physical discomfort from the device.

Based on Mosay's behavior and his own experience in Band-It training, Wisniewski did not think Mosay had actually been shocked.  In particular, Mosay's calm demeanor and lack of signs of physical discomfort were not consistent with Wisniewski's own experience and observations of actual Band-It activation.  Nonetheless, Wisniewski removed the device from Mosay's leg.  There were two small indents on Mosay's leg at the contact points where the Band-It had been tightened and secured for a period of time, but Wisniewski saw no burn marks on Mosay's leg.  Wisniewski then secured the device on Mosay's other leg.

For the next few hours while at the hospital, Mosay said nothing more about being shocked to Hoegger, Wisniewski or any of the nurses that checked on him.  The day after the incident, however, pictures were taken of the red marks on Mosay's leg.  (Dkt. #29-1.)

Mosay later reported to the prison that Hoegger had shocked him.  His allegations resulted in an internal investigation.  Wisniewski ultimately received a verbal reprimand for allowing Hoegger to monitor the remote without being properly trained to do so.  In addition, Hoegger received a three-day suspension for failing to report the incident to a supervisor and violating a work rule by taking control of the Band-It device without proper training.

The current GBCI Band-It training instructor, Lt. Christopher Stevens, viewed the pictures taken of Mosay's ankle area the day after the alleged activation.  In his opinion, the

5

marks were not "activation marks," because marks from an actual eight-second activation would have been darker in color and would have dried out and scabbed up.  In Steven's opinion, the marks appear to be impression marks from the device itself.[3]


OPINION

To succeed on their motion for summary judgment, the defendants must show that there is no genuine issue of material fact and that they are entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  In deciding a motion for summary judgment, the court must view all facts and draw all inferences from those facts in the light most favorable to the non-moving party.  *Schuster v. Lucent Tech., Inc.*, 327 F.3d 569, 573 (7th Cir. 2003).  Still, as the party with the burden of proof, plaintiff Mosay could not rest on his pleadings alone, but must affirmatively demonstrate, through the proposal of specific facts, that there is a genuine issue of material fact that requires a trial.  *Hunter v. Amin,* 583 F.3d 486, 489 (7th Cir. 2009); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).  Even though Mosay did just that by failing to respond to defendants' summary judgment motion in this case, the court will nevertheless determine whether defendants have shown that summary judgment is appropriate.  *Johnson v. Gudmundsson*, 35 F.3d 1104, 1112 (7th Cir. 1994) ("Even if the opposing party completely fails to respond to a summary judgment motion, Rule 56[] permits judgment for the moving party only if appropriate—that is, if the motion

---

[3] Defendants further acknowledge that GBCI was not using the Band-It device according to manufacturer's instructions at the time of this incident.  The manufacturer's instructions are that every time a new Band-It officer starts his shift (approximately every eight hours), he is to place a new Band-It device on the inmate's body part opposite the existing one.  The relieved Band-It officer then removes the first device before leaving.  In contrast, the GBCI Security Director's standing memo in effect at the time of the incident stated that the Band-It should be kept on for 72 hours before being replaced by the next Band-It officer on the hospital vigil.  The record is silent as to how long the same Band-It device was used on Mosay, however.

demonstrates that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law.") (emphasis in original; internal citations and quotations omitted).

Based on the undisputed facts proposed by defendants and now adopted by the court, defendants have shown that they are entitled to summary judgment.  Claims for excessive force in the prison context are governed by the Eighth Amendment.  The Eighth Amendment prohibits the "unnecessary and wanton infliction of pain" on prisoners.  *Hudson v. McMillian*, 503 U.S. 1, 5 (1992); *Estelle v. Gamble*, 429 U.S. 97, 102–03 (1976).  To prove that an officer used excessive force in violation of the Eighth Amendment, the plaintiff must submit evidence showing that the prison official acted "wantonly or, stated another way, 'maliciously and sadistically for the very purpose of causing harm.'"  *Harper v. Albert*, 400 F.3d 1052, 1065 (7th Cir. 2005) (quoting *Whitley v. Albers*, 475 U.S. 312, 320 (1986)).  "Negligence or even gross negligence is not enough; rather the plaintiffs must show actual intent or deliberate indifference on the part of state actors in order to make out an Eighth Amendment claim."  *Id.* (citation omitted).

Here, defendants deny that Hoegger even activated the Band-It device, much less used any force against plaintiff at all.  Both defendants deny that the Band-It device beeped or provided any other indication that it had been activated.  They also state that plaintiff's own behavior was inconsistent with someone who had been severely shocked by the Band-It, including his speaking normally, appearing not to be in pain, not requesting medical attention, and having no burn marks indicative of Band-It activation.  Defendants also offer expert opinion that the red marks plaintiff did experience on his leg were likely indention marks caused by prolonged attachment of the Band-It.

7

Even if plaintiff was, in fact, shocked, the undisputed evidence shows at most that Hoegger caused the shock unknowingly by carelessly wrapping the remote chord or some other inadvertent act, and certainly not by intentionally activating the Band-It.  As for Wisniewski, there is no evidence he acted with deliberate indifference to a substantial risk of serious harm to plaintiff, nor even that he thought there was any risk of harm at all. Rather, the evidence shows that he left the Band-It with Hoegger for the span of two minutes while he used the restroom, solely because he thought it would be safer to leave the remote in the same room with the Band-It device.  In doing so, the evidence certainly supports a finding that Wisniewski violated his training, just as Hoegger violated a GBCI work rule in accepting the remote, but there is no reasonable basis to find that either defendant acted "wantonly" or "maliciously or sadistically for the very purpose of causing harm" to Mosay.

If defendants' version of events as set forth above is accepted as true, as it must be on this record, no reasonable jury could conclude, therefore, that either defendant violated plaintiff's constitutional rights. Obviously, if there was no underlying use of force, plaintiff cannot succeed on an excessive force claim against Hoegger or failure to protect claim against Wisniewski.  And if the underlying use of force was caused simply by Hoegger's carelessness or negligence, or even gross negligence, plaintiff still cannot succeed on an Eighth Amendment claim.  *See Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2472 (2015) ("[I]f an officer's Taser goes off by accident or if an officer unintentionally trips and falls on a detainee, causing him harm, the pretrial detainee cannot prevail on an excessive force claim. But if the use of force is deliberate—i.e., purposeful or knowing—the pretrial detainee's claim may proceed."); *County of Sacramento v. Lewis*, 523 U.S. 833, 849 (1998) ("[L]iability

for negligently inflicted harm is categorically beneath the threshold of constitutional" harm.)  Nor for similar reasons could plaintiff succeed on a claim that Wisniewski failed to protect him from excessive force.  *See Harper*, 400 F.3d at 1064 (holding that plaintiff could not succeed on failure to intervene claim where there was no finding of underlying excessive force).

Plaintiff Mosay might have pointed to one more refuge in response to defendants' motion for summary judgment, since his complaint in this case is "verified," meaning that he swore under penalty of perjury under 28 U.S.C. § 1746 that the facts contained therein are true.  (Dkt. #2.)  A verified complaint *is* admissible evidence in the context of a motion for summary judgment, so long as the plaintiff had personal knowledge of statements contained therein.  *Devbrow v. Gallegos*, 735 F.3d 584, 587 (7th Cir. 2013).  Thus, plaintiff *could* have cited to his complaint as evidence in response to defendants' motion, in an attempt to raise a genuine dispute of material fact.

Even if the court were to consider the allegations in plaintiff's verified complaint, however, they would not be sufficient to defeat defendants' motion for summary judgment. Plaintiff's complaint contains but a few allegations about the August 6, 2012 incident:

- "At some point in the day, Defendant Wisniewski chose to hand the trigger device for the Band-It control Device to defendant Hoegger so that Defendant Wisniewski might relieve himself in the Restroom."

- "Defendant Hoegger chose to spin the trigger device around and around on Defendant Hoegger's finger.  While spinning the trigger device around and around, Defendant Hoegger applied too much pressure to the trigger button and the Bandit Stun device activated, administering over 10,000 volts into the left leg of the Plaintiff."

- "Defendant Hoegger attempted to display some sort of surprise and Defendant Wisniewski continued to laugh and make comments such as: 'That's unbelievable!' and 'Holy fucking shit!' or words to that effect."

(Plt.'s Cpt., dkt. #1, ¶¶ 23-25.)

Plaintiff makes no further allegations about the incident, including that he experienced any pain, dizziness or weakness from the shock.  He also does not include any allegations regarding either defendant's demeanor that would support an inference that Hoegger purposefully activated the Band-It or intended to harm him, or that Wisniewski disregarded a substantial risk of serious harm.  To the contrary, even assuming that plaintiff had personal knowledge that Hoegger chose to spin the trigger device and that he in fact received a full activation of 10,000 volts, plaintiff's allegations still support only a finding of negligence by defendant Wisniewski and perhaps gross negligence by defendant Hoegger, not that either defendant was acting "wantonly" or "maliciously and sadistically for the very purpose of causing harm."[4]

Indeed, rather than dispute defendants' version of events, his allegations seem to confirm that:   (1) Wisniewski gave the Band-It remote to Hoegger solely because Wisniewski needed to use the restroom; (2) if Hoegger did activate the Band-It, he did so because he was acting carelessly, not wantonly; and (3) both defendants were, or at least acted, surprised or confused by plaintiff's claim that he had been shocked.

To the extent plaintiff may have believed that his complaint should have been sufficient to raise a genuine factual dispute sufficient to prevent summary judgment, he is mistaken.  No reasonable jury could find excessive force or failure to protect based solely on

---

[4] Even defendant Wisniewski's alleged, after-the-fact reaction, crass and insensitive as it may have been, would not support a finding that he acted wantonly, maliciously or sadistically by allowing Hoegger to hold the trigger for a few minutes while he went to the bathroom.

10

the assertions in plaintiff's complaint.   Accordingly, defendants are entitled to summary judgment.

## ORDER

IT IS ORDERED that the motion for summary judgment filed by defendants Dale Hoegger and David Wisniewski (dkt. #22), is GRANTED.  The clerk of court is directed to enter judgment for defendants and close this case.

Entered this 19th day of May, 2016.

BY THE COURT:

/s/

_____

WILLIAM M. CONLEY
District Judge

11